No. 72.—WILEY MITCHUM, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] Upon an indictment for murder before the Superior Court in the County of Stewart, the proof was that the crime was committed *in the house of the witness, at Florence, Stewart County: Held,* that it was sufficiently proven that the crime was committed within the jurisdiction of the Court.

[2.] The indictment charged that *William R. Morris* was murdered by the prisoner, and the proof was that *W. R. Morris* was slain by him: *Held,* that the proof of identity was well left to the Jury, and they having found a verdict of guilty, the verdict ought not to be disturbed.

[3.] Upon trial, one witness testified, "that prisoner stooped down, and as witness heard a rattling on the floor, and did not see the knife afterwards, he supposed that prisoner picked it up. Prisoner rose with a six barrelled pistol in his hand—presented it at the breast of deceased, not more than six inches distant—took deliberate aim long enough to count ten or fifteen before he fired. He fired the pistol about the right nipple. Deceased brought a groan—his face contracted—fell upon the floor, and in about five minutes expired." *Held,* that the killing was sufficiently proven.

[4.] A witness testifies that he was some thirty or forty yards from the house when deceased was shot; upon hearing the report of the pistol, he looked towards the house and saw a person that he took to be the prisoner, run out, who ran a few paces and turned and ran again into the house, and immediately ran out again, and ran to where witness stood. He ran slow and awkward, which induced witness to think that he was very drunk. When he came to witness, he seemed greatly agitated and troubled, and at the moment of coming up to him exclaimed, *that he would not have done it for the world.* Witness further testified that one minute would probably cover the time from the firing until the prisoner uttered the exclamation— two certainly would: *Held,* that under these circumstances, the exclamation of the prisoner was admissible as part of the *res gestæ.*

[5.] Declarations to be a part of the *res gestæ* must be contemporaneous with the main fact, but to be contemporaneous they are not required to be precisely concurrent in point of time. If the declarations spring out of the transaction—if they elucidate it—if they are voluntary and spontaneous, and if they are made at a time so near to it, as to preclude reasonably the idea of deliberate design, then they are to be regarded as contemporaneous.

[6.] If one is killed by another by a pistol shot, and the intention to shoot entered the mind of the slayer but one moment before the firing, this is evidence of express malice, *provided* that there was no assault upon the person killing, or attempt otherwise to do him a violent personal injury by the deceased.

Mitchum *vs.* The State of Georgia.

[7.] It is error in the Court, when requested to prevent it, to permit counsel to comment on facts in their argument to the Jury not in evidence.

[8.] It is not competent to ask a witness as to what he had sworn on a former occasion, with a view to impeach him, if his testimony on that occasion is of itself inadmissible in evidence.

[9.] It is not good ground for a new trial that a Juryman had said before the trial, "if the evidence was as he had heard it, the prisoner was guilty and would be hung."

Indictment for murder, in Stewart Superior Court. Tried before Judge IVERSON.   May Term, 1852.

The plaintiff was placed upon his trial under an indictment, charging him with the murder of William R. Morris.

The State introduced *Wayne W. Eilands,* who testified that he was present at the time a difficulty occurred between W. R. Morris and prisoner, on the 1st Monday in October, 1851, at the house of witness, in Florence, Stewart County. Morris was standing at the counter of witness for an hour; had taken three drinks; commenced singing and talking, which caused him to cough and vomit. Prisoner cursed him and said, " God d—n you, if you want to puke, go out of the house ;" took hold of him and tried to push him out of the door; deceased caught hold of the door and said " not exactly yet." Prisoner drew a large Spanish dirk and struck deceased on the shoulder; deceased asked him if he was in earnest; prisoner said he was; deceased pulled out his knife and dropped it on the floor; prisoner stooped down, and witness thinks, picked up the knife; prisoner then drew a six barrelled revolver—presented it within six inches of the breast of deceased—took deliberate aim and fired ; deceased died in five minutes ; prisoner ran out of the house, but was caught and brought back; never saw the prisoner before that day; had no authority in that house; deceased was quite drunk; prisoner was drinking, but not drunk; pistol was self-cocking.

*Benjamin Horton,* sworn by defendant, testified, that he was present at the time of the killing; prisoner had no difficulty with deceased ; prisoner and witness were talking together, and

prisoner was flourishing his pistol about, when it fired; prisoner was then looking at the witness, and appeared alarmed when the pistol fired; prisoner was drunk; the pistol belonged to witness, who loaned it to prisoner the evening before; was very easy on trigger; prisoner and deceased were not acquainted.

*Thomas Gilbert,* was some thirty or forty yards from the house when the pistol fired; prisoner ran out to where witness was standing; seemed to be drunk, and very much agitated; not over two minutes elapsed from the firing, before prisoner reached witness. Defendant's counsel proposed to prove by this witness that at that moment prisoner said " that he would not have done it for the world," which evidence was ruled out by the Court.

*Benjamin Horton,* re-examined. The moment the pistol fired, prisoner asked witness " if he had killed him ;" witness said he did not know; prisoner said " he would not have done it for the world if he had."

*Job C. Patterson* (introduced by the State) contradicted *Horton* in some of the *minutiae* of his testimony.

The Jury returned a verdict of guilty. Whereupon defendant moved for a new trial, on the grounds—

1st. That there was not sufficient proof that the alleged crime was committed in the jurisdiction of the Court.

2d. That there was not sufficient proof of the identity of the person represented in the bill of indictment to have been slain, with the person proven on the trial to have been slain.

3d. That there was not sufficient proof that the deceased was slain by the prisoner.

4th. That there was not sufficient proof that the deceased was slain by the prisoner.

5th. That the Court erred in rejecting the evidence proposed to be proven by Thomas Gilbert, as above stated.

6th. That the Court erred in charging the Jury that it was evidence of express malice on the part of the defendant to constitute murder, if it appeared that the intention to shoot entered the mind of the defendant only one moment before the firing,

provided there had been no actual assault on the prisoner by the deceased.

7th. That the Court erred in allowing the Solicitor General, in the concluding argument (although objected to by counsel for the prisoner,) to support the testimony of *Eilands*, by stating that he was an unwilling witness for the State; that he had refused to come under subpœna and was brought by arrest under attachment; none of which was in evidence before the Jury; the Court remarking that it was allowable, because B. K. Harrison, one of the defendant's counsel, had in his argument to the Jury, stated that *Eilands* was locked up on the Sabbath before the trial with the father-in-law of the deceased and the prosecutor, drinking with them, none of which was in evidence, Mr. Harrison contending that Eilands was a willing and a bribed witness.

8th. That the Court erred in refusing to permit the witness *Eilands* to be asked the question whether he did not on his examination before the committing Magistrate, swear, "that immediately after the shooting, the prisoner, being brought into the presence of the body of deceased, asked witness if he killed him; witness answered he did; prisoner said, "Lord, I am sorry for it, I did not intend to kill him."

9th. Because Wm. W. Beman, the foreman of the Jury, before he was sworn, had said to Elijah Bostwick, "that if the testimony was as he had heard it, the prisoner was guilty and would be hung;" which fact was unknown to the prisoner until after the trial.

10th. That the verdict is contrary to the evidence.

11th. That the verdict is contrary to law.

In support of the *ninth* ground, defendant's counsel filed the affidavit of *Beman* the Juror, stating, that not being examined on his *voire dire* he had not stated the fact that he had expressed an opinion; that he did express the opinion to Bostwick, but that he was influenced in finding his verdict only by the evidence and the charge. Also the affidavit of the defendant that he was ignorant of this fact until after the trial.

It appeared to the Court that Beman, with a view to deter the counsel from selecting him as a Juror, had said to B. K. Harri

son, one of defendant's counsel, before the trial, that " he had better not take him as a Juror, as he would hang the prisoner."

The Court refused to grant a new trial on either of the grounds taken, and error has been assigned on each ground.

GAULDING and HARRISON, for plaintiff in error.

Sol. Gen'l. WILLIAMS and JNO. A. TUCKER, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] The errors complained of in this case, grew out of a refusal to grant the prisoner a new trial. And first, it is claimed that the presiding Judge erred in refusing a new trial upon the ground that it was not proven that the crime with which the prisoner was charged, was committed within the jurisdiction of the Court. By the Constitution of the State it was triable alone in the County where it was committed, and the Court had jurisdiction over it no where else; to give jurisdiction, therefore, it was necessary to prove that it was committed in the County where the Court was sitting. The Court sat, and the trial was had in the County of *Stewart,* and the proof was that the crime was committed *in the house of the witness, at Florence, in the County of Stewart.* That the Court was sitting in the *County of Stewart* and *State of Georgia,* was a fact known to the Court from its own records and the public law. When therefore it was proven that the crime was committed in the County of *Stewart,* it was proven that it was committed in the County in which the Court entertained jurisdiction over it. *Non constat* that there is in *Georgia* any other County called *Stewart.* There is no use in discussing a question like this. If such an exception were sustainable, it could be done alone by taking leave of common sense, and by yielding the solid virtue of judicial investigation to a distinction too subtle to command the least respect.

[2.] The next exception goes upon the assumption that the proof did not identify the person charged to have been murdered with the person proven to have been slain.. The person

slain, according to the indictment, was *William R.* Morris, and the person proven to have been slain, was *W. R.* Morris. It is claimed that the variance between the allegation as to the person and the proof is fatal.

It is very clear that there must be a killing before there can be murder, and it is equally clear that the prisoner cannot be convicted of murder unless he is proven to have slain the person which the indictment charges him to have murdered. On this indictment for the murder of *William R. Morris,* the plaintiff in error could not be convicted upon proof that he had murdered *John Stiles.* So vital is this, as a practical rule, that its observance substantially, must be insisted upon with strenuousness. It may be conceded that in former times, such a variance would have been held decisive, and even now, we are not altogether satisfied that we are right in not so holding it. We think however, whether *W. R. Morris,* the person slain according to the testimony, was or was not the *William R. Morris* charged to have been slain in the indictment, was a question safely trusted with the Jury. *W. R.* it is true, may represent *Wilson R.* or *Willis R.* ; but these letters may also represent *William R.* The Jury had the right to consider the question of identity, not alone in the light of the testimony specially referred to, but also in the light of all the attendant circumstances. They were satisfied with the identity, as is evidenced by their verdict, and we will not disturb it on this account.

[3.] A new trial was asked and refused, on the ground that there was not sufficient evidence that the deceased was slain by the prisoner; and to the ruling on this point the prisoner takes exception. A mere recital of a portion of the evidence, is sufficient to quiet this complaint. The witness *Eilands* says, " Prisoner stooped down, and as witness heard a rattling on the floor, and did not see the knife afterwards, he supposed that prisoner picked it up ; prisoner rose with a six barrelled pistol in his hand—presented it at the breast of deceased, not more than six inches distant—took deliberate aim long enough to count ten or fifteen before he fired ; he fired the pistol about the right nipple ; prisoner ran out and was caught about fifty yards from the house

of witness; deceased brought a groan—his face contracted—fell upon the floor, and in about five minutes expired."

It is difficult to find in the annals of homicide, the killing proven with such terrible distinctness, and with such tragic certainty. The Juryman who could doubt, in the face of this testimony, that the deceased was shot dead by the prisoner, must be inconceivably skeptical. It is out of the question to conceive that any one of the Jury that tried this case, could or did doubt. The learned counsel contends that there was no evidence that the pistol was charged with ball; none of a wound; none of the flow of blood, and therefore none that the deceased came to his death by the hands of the prisoner. These details are supplied by the most demonstrative generalities, to wit: the proximity of prisoner to the deceased—the deliberate aim at a vital part—the firing—the groan—the contraction of the face—the fall, and the death. It is within the range of possibilities, that this man died from some other cause, and not by the hands of the prisoner; but so to believe, would be to substitute a miracle for the most irresistible deductions of reason from cause and effect. It is sufficient, if the evidence, whatever be its character, whether positive or presumptive, direct or circumstantial, satisfies the understanding and conscience of the Jury. *Giles vs. The State,* 6 *Geo. R.* 286.

The 4th exception is but a repetition of the third.

[4.] The rejection of the sayings of the prisoner, as proven by *Thomas Gilbert,* we think was an error, and upon this and one other ground to be noticed in its order, we are constrained to award a new trial.

A well ascertained rule of evidence is, that a party cannot be permitted to manufacture evidence for himself. A consequence flowing out of this rule is that the sayings of a party in his own behalf cannot be proven. There are exceptions to the inadmissibility of such sayings, and however well founded in reason and justice the rule may be, the exceptions are vindicated by both reason and justice. It is however right to guard the rule with severe vigilance, and to admit the exceptions with great caution. Without such a rule it would be competent for every

criminal to provide for his acquittal, with a very moderate amount of forecast and self-possession, and go " unwhipped of justice ;" whilst at the same time, without the exceptions, in some cases, innocence would meet the felon's fate.    For example, a man of untarnished life and character is found on the highway with an instrument of death in his hand, reeking with blood, but freshly drawn from the heart of one who is expiring at his feet.    With no witness to the transaction, such a man is convicted by the circumstances, and would, by the operation of the general rules of the law, die as a murderer.    In the moment of discovery, however, he is heard to exclaim, " I slew him in defence of my life."    The admission of these sayings would save the life of an innocent man, whilst their exclusion would consign him to the gallows.    The case supposed is an extreme one, and is given for illustration, and not for the purpose of testing the correctness of the ruling in this case.    In the language of this Court, in *Monroe vs. The State,* "if we unconditionally refuse to allow a defendant under any circumstances, to have his conduct interpreted by his acts and speech, we shall frequently deliver over the accused a helpless and hopeless sufferer to the penalty of the law."    5 *Geo. R.* 132.    Whenever the sayings constitute a part of the *res gestæ,* they are within the exception and are admissible.    We consider that the excluded sayings of the prisoner in this case, were a part of the *res gestæ.* What then is meant by *res gestæ?*    I cannot more satisfactorily answer this question than by transcribing what I said on a former occasion.    " The idea of the *res gestæ* presupposes a main fact.    With this preliminary remark, I answer that the *res gestæ* mean the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character.    I do not claim that this definition is perfect, for I know that the *res gestæ* are different in different cases.    No definition could be found so comprehensive as to embrace all cases ; hence it is left to the sound discretion of the Courts what they shall admit, to the Jury along with the main fact, as parts of the *res gestæ.*    But perhaps this definition embraces as nearly all that is meant in legal parlance by

that phrase as any other that can be drawn from the books. One peculiarity of the main fact or transaction ought to be noted, and that is that it is not necessarily limited as to time— it may be a length of time in the action.    The time of course depends upon the character of the transaction; it is however, well settled, that the acts of the party, or the facts or circumstances, or declarations which are sought to be admitted in evidence are not admissible, unless they grow out of the principal transaction, illustrate its character and are contemporary with it."    Again I say, "Declarations as parts of the *res gestæ*, made at the time of the transaction, are regarded as verbal acts, indicating a present purpose and intention, and are therefore admitted in proof like any other material facts.    An indispensable characteristic of declarations is that they must be made at the time of the act done, which they are supposed to characterise; and further, they must be calculated to unfold the nature and quality of the facts they are intended to explain, and so to harmonise with them as obviously to constitute one transaction." 3 *Kelly*, 517, 518.    As applicable to this case, I refer also to a proposition stated by *Judge Lumpkin*, in his opinion in *Monroe vs. The State*.    It is this, "When an act is done to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from which the motive may be collected, is a part of the *res gestæ*."    5  *Geo. Rep.* 85.    In determining questions about the *res gestæ*, it is an error to undertake to test them by a definition or rule.    For what is the *res gestæ* of a given transaction must depend upon its own peculiarities of character and circumstances.    Courts must be allowed some latitude in this matter.    *Rawson vs. Haigh*, 2 *Bing.* 104.    *Ridley vs. Gyde*, 9 *Bing.* 349, 352.    *Pool vs. Bridges*, 4 *Pick.* 379, 11 *Pick.* 309.

Adjudicated cases, determined by able Courts, are safe guides; and when not to be found, like that which is before us, we are left to apply to it the principles which the rule embraces, irrespective of the rule itself.    In applying these, let us inquire what is required to bring a declaration within the exception of the *res gestæ*.    They must grow out of the main fact—they

must serve to illustrate it, and they must be made contempora-
neously with it. When these things are true of declarations, they
are provable, not as the testimony of the declarant, but as par-
taking of the nature of facts. They derive their credibility not
from his veracity, but from their relation to the transaction
out of which they spring. Made at the same time with the
main fact—evoked by it without premeditation, and for that
reason explanatory of the mind and purpose of the actor as it
is involved in that fact, they are presumed to be as veritable—
as reliable as the fact itself, and would derive no enhancement
of their credibility from the oath of the declarant. Such I take
to be the philosophy of the *res gestæ*, so far as constituted of de-
clarations. The weight which they are to receive at the hands
of the Jury, will depend upon the closeness and fullness of their
relation to the transaction out of which they spring; their prox-
imity in point of time to it, and the strength of the light which
they shed upon it. The *motive* with which an act is done is
frequently the point of inquiry to which the attention of Courts
is directed. To ascertain that, contemporaneous declarations
are admissible, "Where a person, (says *Prof. Greenleaf,*) does
any act material to be understood, his declarations made at the
time of the transaction and expressive of its character, *motive* or
object, are regarded as verbal acts, indicating a present purpose
and intention, and are therefore admitted in proof like any other
material facts." *Greenleaf's Evid.* §108. With these princi-
ples in view, we come to the immediate question made in this
record. The transaction or main fact here is the killing—it is
the mind or motive with which the prisoner was actuated when
he slew the deceased, that was to be ascertained. The great
inquiry in this case, (as in all cases of murder,) was whether the
killing was with malice, express or implied. Now if the decla-
rations of the prisoner grew out of the killing, and was, accord-
ing to the construction of the rule which I shall give, contempo-
raneous with it, and tend to disprove malice, then they illus-
trate or explain the fact of the killing, and are admissible.
Adverting to the declarations, it seems that the witness was
within thirty or forty yards of the house when the deceased was

Mitchum *vs.* The State of Georgia.

shot. Upon hearing the report of the pistol, witness looked towards the house and saw a person that he took to be the prisoner run out—who ran a few paces and turned and ran again into the house, and immediately ran out again, and ran to where witness was standing; he ran slow and awkward, which induced witness to suppose he was very drunk; when he came to witness, he seemed greatly agitated and troubled, and at the moment of his coming up to him, he exclaimed "that he would not have done it for the world." *Gilbert* further testified that "one minute would probably cover the time from the firing until the prisoner uttered the exclamation, two certainly would." For a full understanding of the point, I have detailed the testimony of *Gilbert* with a little more minuteness than it is found in the Reporter's brief. The most important matter to be considered is the *time* that elapsed between the killing and the utterance of the rejected exclamation; that was from one to two minutes. Probably, says *Mr. Gilbert, one*—certainly, not more than *two*. Take the medium time between one and two, and it is one and one-half. The agitation of the prisoner is to be noticed—also the fact that no one was in pursuit of him; no attempt had been made at the time that he spoke to the witness to arrest him; no one present at that moment had spoken to him. His coming to where the witness was, seems to have been voluntary, and the exclamation spontaneous. The meaning of the exclamation is also important. The natural interpretation of it, seems to me to be the expression of profound regret or remorse; such as a man would feel after unintentionally killing a fellow-creature. Upon the hypothesis that the killing was not a deliberate murder, but the result of a reckless, drunken bravado use of a hair-trigger, self-cocking revolver, (and the defence seems to have been put chiefly on this ground) this interpretation is a fair and natural interpretation. It is true, that such an exclamation, made after the fact, might be the deliberate and studied fabrication of guilt, made with a view to an acquittal. I must believe, however, that the circumstances do not warrant this construction, and that the former interpretation is most reasonable. The short period of time that had inter-

vened, and the agitated manner of the prisoner, forbid the idea of deliberate design; he can scarcely be supposed within, ninety seconds from the fall of his victim, to have deliberated with himself upon the expediency of such a declaration; he cannot be necessarily believed to have in fact so deliberated, because his running out of the house immediately after the firing, and then back again, and then out again, and his distressed and agitated appearance when he reached the witness, exhibit a state of mind incompatible with such a belief. Nor do I believe that such an exclamation would readily or naturally escape from a man who had but just satisfied the demands of a murderous malice. Such a man, at such a moment, would most naturally in his heart, exult in the very fiendishness of the act. Remorse would not, in the very moment of gratified vindictiveness, be the feeling of such an one; and not feeling, he would not be likely to express it. Such being the most probable meaning of the declaration, does it not spring out of the act? It seems to me that it is its legitimate fruit, and bears as necessary a relation to it as an immediate effect bears to a cause. Not only so, but it serves to illustrate it. It sheds light upon the question of malice—upon the motive, or which is the same thing, the want of motive, under which the prisoner acted; that is to say, it serves to explain the killing, by showing that it was not his intention to kill, and thus rebuts the implication of malice. To what extent it will go, if to any, when considered in connection with all the testimony in the case, is for the Jury to determine. My purpose in all that I have said, is to bring these declarations within the rule of the *res gestæ*. I mean to express no opinion as to the guilt or innocence of the prisoner.

[5.] The requirement of the rule farther is, that the declarations be *contemporaneous* with the transaction. Now, where the books say—when this Court has said—that the declarations must be contemporaneous with the act, or when they or this Court say that the declarations must be made *at the time* of the act; it is not to be understood that we or the books assert that declarations are never to be admitted unless their utterance is exactly coincident in point of time with the act. Declarations,

in the legal sense of the word, may be *contemporaneous* with the act, when they precede or follow the act; and when they are to be admitted and when rejected, if not coincident with the act, is a question for judicial discretion, of embarrassing nicety—one which must depend upon the application of the principle upon which the rule is founded, and which I have endeavored to state, to the circumstances of each case. If the declarations appear to spring out of the transaction—if they elucidate it—if they are voluntary and spontaneous, and if they are made *at a time so near to it*, as reasonably to preclude the idea of deliberate design, then are they to be regarded as contemporaneous. Amplification cannot make the view which I have of this point plainer, and I shall therefore leave it here, referring to a few authorities to sustain the position that to be contemporaneous, declarations are not always required to be exactly concurrent with the act.

In *Rawson and another vs. Haigh et al. Park, J.* says, "it is impossible to tie down to time the rule as to the declarations. We must judge from all the circumstances of the case. We need not go the length of saying that a declaration made a month after the fact, would itself be admissible. But if, as in the present case, there are connecting circumstances, it may even at that time form a part of the whole *res gestæ*." 2 *Bing.* 99. See also 14 *Serg. and Rawl.* 275. 4 *Pick. R.* 378. 21 *Howell's St. Tr.* 542. 1 *Starke R.* 353. 1 *Metc.* 247. 9 *Bing. R.* 349. *Reynolds' case*, 1 *Kelly*, 230. 5 *Geo. R.* 85. In this case the intervening time being only one minute and a half, and all the circumstances precluding the idea of deliberation, we are satisfied that proof of the declarations ought to have been admitted.

[6.] The bill of exceptions represents the presiding Judge as having erred in charging the Jury, "that if the intention to shoot entered the mind of the defendant only one moment before the firing, it was evidence of express malice, *provided* there had been no actual assault on the prisoner by the deceased." Whether this was a case of express or implied malice, or neither, we are not called upon to decide. The instruction I am now

considering, was warranted by the evidence; indeed the plaintiff in error does not claim that it was not. He contends that admitting the facts to be as the presiding Judge states them, the proposition is not good law. We differ with the learned counsel for the plaintiff in error. Express malice, by our code, ·is "that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof." *Prince*, 622. Deliberate intention to take life unlawfully is the prime element of express malice. This intention must be manifested by external circumstances capable of proof. Previous threats, ancient grudges and way-laying, are the external circumstances usually referred to, to illustrate a case of express malice. The strength and clearness of such illustrations sometimes have the effect of excluding from our consideration other circumstances susceptible of proof, which demonstrate a deliberate intention to kill. The charge of the Court excludes an actual assault by the deceased on the prisoner, and properly, for in that event the killing would be manslaughter. If there is no assault and no attempt on the part of the person killed to commit a serious personal injury·on the person killing, and the intention to shoot entered the mind even a moment before the firing, and the slayer does shoot, and the effect of the shot is death, I can see no reason why a deliberate intention to kill is not manifested by the circumstances. In the absence of all provocation, by assault or otherwise, to rise up—draw a pistol, and in one moment discharge its contents into the breast of his neighbor, the intention to *shoot* at the very moment of firing, would be manifest by the circumstances, all of which would be capable of proof by eye-witnesses, and the *deliberate intention* to kill would be demonstrated by the proven circumstances. Whether there was no assault, and whether there was an *intention* to shoot, are questions for the Jury. Were we satisfied that the Court erred in this charge, we would not send the case back on that account, because, if the case put by the Judge be not a case of express malice, it is of implied, and the consequences would be the same in either event to the prisoner.

[7.] The seventh exception is founded on the refusal of the

Mitchum *vs.* The State of Georgia.

Court to restrain the Solicitor General, although requested so to do, by counsel for the prisoner, from commenting on facts not in evidence, in his concluding speech to the Jury. This we think was an error. We have had occasion to consider the habit of counsel in addressing the Jury, of commenting upon matters not proven and not growing out of the pleadings before, and have been content with visiting it with a decided and emphatic disapproval. *Berry vs. The State,* 10 *Geo.* 522, 523. We entertain no shadow of doubt, as to the necessity of pronouncing it as we now do, illegal and highly prejudicial to a fair and just administration of the rights of parties, either on the criminal or civil side of the Court. It is the duty of the Court to prevent such comments, and in all cases where this is not done, provided the Court is requested to prevent them, we shall hold, as we rule in this case, that it is good ground for a new trial. There was, it is true, some excuse for the license conceded to the *Solicitor General* in this case, in the fact that counsel for the prisoner had already taken the same liberty in his argument to the Jury. The *Solicitor General,* no doubt, felt called upon by the obligations of his office, to remove any wrong impression which the argument of counsel for the prisoner had made as to the credibility of the witness. Disregarding, however, these things, we have no option but to make this case the occasion of establishing a rule upon this subject. In doing this, I am sure that it is scarcely necessary to say that we disclaim any purpose of inflicting a personal censure upon the able and upright Judge who presided in the cause, or upon the counsel and the prosecuting officer. If no other reason existed for this disclaimer, (and there are many) sufficient reason would be found in the usage of our Courts, which has gone very far to sanction the habit referred to. Its practical tendency is bad upon the Court, the bar and the Jury. If this were all, perhaps our duty would stop with the expression of such an opinion; but this is not all—for in our judgment it is violative of the rights of the citizen litigant in the Courts of justice; and if so, we are not at liberty to stop short of making it cause for a new trial. It is not foreign to the subject to say that it is the duty of counsel to guard, by the most

scrupulous propriety of demeanor, in the conduct of a cause, the dignity and honor of the profession. Connected as it is, most intimately, with the administration of justice, it should be protected most vigilantly from falling into popular disrepute. It ought, as I verily believe it does, to command the respect of the wise, and the reverence of the good. Power and place—hereditary wealth—stupidity in high social position, and even genius, pandering to a popular taste for caricature; jealous of the power which it wields upon governments, have labored to degrade it. Still in this country and in England, if no where else, the bar is the ladder upon which men mount to distinction; the lawyer is the champion of popular rights; the class to which he belongs is more influential than any other; and counsel, yes, feed counsel, is indispensable to a fair and full administration of justice. When learning and character, and practised skill, and eloquence, and enthusiam, chastened by discretion, are enlisted in behalf of the litigant, he may rest assured that he holds in his counsel the very best guarantee against all forms of wrong and oppression in the administration of the law. It is true, that he is paid for his services—and what of that? Are not Princes and Premiers, Presidents and Priests also paid? One thing never yet was bought with money, and that is the soul-engrossing identification of counsel with his client. It is the gratuitous bestowal of his sympathy, drawing forth the masterly powers of his genius and the rich treasures of his learning, that makes the great lawyer, the honored and influential citizen. The approval of conscience and the respect of good men are his reward; far richer than the stipulated fee of these days, or the *honorarium* of the Roman advocate. If I thus magnify the office of the counsel, it is for the purpose of saying that its very importance makes indispensable the exclusion of the habit which we now condemn. But I proceed, claiming the indulgence on account of these general remarks, of the critical professional reader, to test the rule we lay down by strictly legal considerations. That rule is, that it is contrary to law for counsel to comment upon facts not proven. He represents his client—he is the substitute of his client; whatever the client may do in the conduct of his

cause, therefore, his counsel may do.  In relation to his liberty of speech, the largest and most liberal freedom is allowed, and the law protects him in it.  The right of discussing the merits of his cause, both as to the law and the facts, is indispensable to every party; the same right appertains to his counsel.  The range of discussion is wide——very wide.  He is entitled to be heard in argument upon every question of law, that may arise in the cause; in his addresses to the Jury it is his right to descant upon the facts proven or admitted in the pleadings; to arraign the conduct of parties; impugn, excuse, justify or condemn motives, so far as they are developed in evidence; assail the credibility of witnesses, when that is impeached by direct evidence, or by the inconsistency or incoherence of his testimony, his manner of testifying, his appearance, or by circumstances.  His illustrations may be as various as are the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wing to his imagination.  To his freedom of speech, however, there are some limitations.  His manner must be decorous.  All Courts have power to protect themselves from contempts, and indecency in words or sentiments is a contempt.  This is a matter of course in the Courts of civilized communities.  Nor is it matter of form merely; for no Court can command from a civilized public that respect which is necessary to an efficient administration of the law, without maintaining in the business of the Court that courtesy, and dignity, and purity, which characterize the intercourse of gentlemen in private life. It has been found difficult to prescribe a legal limitation to the lawyer's liberty of speech in the performance of his duties in a cause.  That the discussions should be *free* is perfectly obvious; and even abuses should be tolerated, rather than a privilege so valuable should be abridged.  We feel the delicacy of the ground upon which we tread, and are solicitous of being understood as carrying our present ruling no farther than to cover the precise question made in the assignment.  The British Courts have not found themselves free from embarrassment on this head.  In the leading case upon this subject, it was settled that

counsel is not liable.to an action for words spoken in a judicial proceeding, provided they are *pertinent* to the cause, and spoken without malice ; and this seems to me, after a careful examination, to be the nearest approach to a definite limitation upon the right of speech in Court to be found in the English books. It is clearly a vague and fluctuating rule, for what is *pertinent* is wholly uncertain, depending upon the idea which the Court who tries the suit against the counsel, may entertain of *pertinency,* and upon the various character of cases and circumstances, in which, and under which the objectionable words may have been uttered. In the case referred to, *Lord Ellenborough* said that " an advocate was entitled to use the information communicated to him by his client in a fair and *bona fide* exposition of the merits of the case submitted to his conduct; he was privileged in commenting on the case and making observervations on the instruments or agents by whom the case was brought into Court. This privilege belonged to him, and might be exercised with a large and liberal freedom." *Bayley, J.* adopted the rule laid down in *Brooke vs. Sir Henry Montague,* in *Cro. Jac.* 90, and quoted it as follows, " that a *counsellor at law,* retained, hath a privilege to enforce anything that is informed unto him for his client, and to give it in evidence, it being *pertinent* to the matter in question, and not to examine whether it be true or false, but it is at the peril of him who informs it. For a *counsellor* is at his peril to give in evidence that which his client informs him, *being pertinent* to the matter in question. Otherwise an action on the case lies against him by his client, as *Popham* said, and although it be false, he is excusable, *being pertinent* to the matter." *Abbot, J.* said, " that the rule of determining whether this action was maintainable against a *barrister,* must be governed by the *pertinency* of the words to the matter in issue." Opinion to the same effect was expressed by *Holroyd, J.* So that it would seem that in the maintainance of his client's cause, counsel is free to do or to say anything that is *pertinent* to the matter in question, and that he takes the hazard of his words and actions being pertinent. *Hodgson vs. Scarlett,* 1 *Holt, N. P. C.* 621, 622, 623, 624. 3 *Eng. C. L. Reps.* 243, 244, 245. *Cro.*

*Jac.* 90.  1 *Hawk.* 73.  *S.* 8.  1 *Saunders*, 132.  4 *Coke*, 14
*B.*  1 *B. & A.* 232.  3 *Black. Com.* 29.  I adduce this rule
and quote these authorities, in order to say that they sustain our
judgment, because statements of facts not proven, and com-
ments thereon, are outside of a cause; they stand legally irre-
levant to the matter in question, and are therefore not pertinent.
If not pertinent, they are not within the privilege of counsel.

But farther; every person accused is entitled to be tried by a
Jury, and according to the laws of the land.  This is the great-
est of all the privileges conferred by *Magna Charta,* and it is
guaranteed by our own fundamental law.  Now I assume that
this privilege is violated, if counsel are permitted to state facts
and comment upon them in argument against the adverse party,
which are not before the Jury by proof regularly submitted.
The accused is not only entitled to have a trial by a Jury of
twelve men, but he is entitled to have his trial conducted ac-
cording to the course and usage of the Common Law.  "By
the law of the land," as used in the great Charter, has been
understood due proof of law, that is, indictment or presentment;
but that is not now the only meaning of these words.  They
mean that the party charged, shall be indicted, arraigned and
tried according to the rules of law and the established usages of
the Courts.  Trial by Jury! how imperfect a privilege would
that be, if the forms of law were abandoned—if the rules of
evidence were disregarded!  An essential element in the trial
by Jury is that their verdict shall be rendered according to the
facts of the case, legally produced to them.  They are sworn to
give their verdicts according to *evidence*, and if they find with-
out evidence, or against evidence, a new trial will be granted.
They cannot even render a verdict upon knowledge within
their own breasts; but if a Juryman has knowledge of facts per-
tinent to the issue, he may be sworn.  The law, with great care-
fulness, prescribes rules by which facts are to be submitted to
the Jury.  Testimony must be relevant—the best evidence the
nature of the case admits must be produced; hearsay is exclud-
ed; interest in the witness will disqualify, &c.; and by our
own Constitution, in criminal cases the witnesses are to be con-

fronted with the prisoner. He has in all cases the right of cross-examination. All these and many more rules are prescribed for the ascertainment of the truth of those facts upon which verdicts are to be rendered. The law to be administered may depend upon the facts proven. *Ex facto oritur jus.* " And if the fact (writes *Blackstone,*) is perverted or misrepresented, the law which arises from thence will unavoidably be unjust or partial; and in order to prevent this, it is necessary to set right the fact, and establish the truth contended for, by appealing to some mode of *probation* or *trial,* which the law of the country has ordained for a criterion of truth and falsehood." 3 *Black. Com.* 330. When counsel are permitted to state facts in argument and to comment upon them, the *usage* of the Courts regulating trials is departed from, the laws of evidence are violated, and the full benefit of trial by Jury is therefore denied. It may be said in answer to these views, that the statements of counsel are not evidence; that the Court is bound so to instruct the Jury, and that they are sworn to render a verdict only according to the evidence. Whilst all this is true, yet the effect is to bring the statements of counsel to bear upon the verdict with more or less force, according to circumstances; and if they in any degree influence the finding, the law is violated, and the purity and impartiality of the trial are tarnished and weakened. If not evidence, then without doubt, the Jury have nothing to do with them, and the lawyer no right to make them. And just here, the argument might be rested. It is not reasonable to believe that the Jury will disregard them. They may struggle to disregard them ; they may think that they do disregard them, and still be led involuntarily to shape their verdict under their influence. That influence will be greater or less, according to the character of counsel, his skill and adroitness in argument, and the naturalness with which the statements stand connected with other facts and circumstances in the case. To an extent not definable, yet to a dangerous extent, they are evidence, not given under oath—without cross-examination, and irrespective of all those precautionary rules by which competency is tested.

In this case, the statements and comments had reference to

the character and credibility of the witness.   I know of no rule of law which authorizes the credibility of a witness to be impeached or fortified thus.   The manner of attacking or defend· ing the character of a witness is fixed by law; and fixed, among other things, that he may not be subject to irregular and irresponsible assaults upon his veracity and fairness.   He, as well as parties and counsel, has rights which it is the duty of the Court to protect.   It were a cruel injustice to permit his character to be driven to and fro like the shuttlecock, by the outside statements of counsel.   Where shall the license stop ?   If allowed against the credibility of a witness, then with equal reason they are to be allowed as touching the merits of the issue. If crimination is granted, recrimination cannot be refused.   If statements on one side are permitted, counter-statements on the other cannot be denied.   If allowed to men of the highest honor, they cannot be denied to those few to be found in all professions destitute of all honorable principle.   The *concession*, carried out in its legitimate consequences, would convert the stern, inflexible law and order of a Court of Justice, into confusion, uncertainty and injustice.   All these objections apply alike to criminal trials and civil actions—to the prosecuting officer and to counsel.

[8.]   There was no error in the Court's refusal to permit the witness, *Eilands*, to be asked, "whether he did not swear before the committing Magistrates, that immediately after the shooting, the prisoner being brought into the presence of the body of deceased, asked witness if he killed him ; witness answered he did, and prisoner said, "*Lord, I am sorry for it, I did not intend to kill him.*"   If this testimony of *Eilands'* was sought to be re-produced, to get in the declarations of the prisoner, then it was illegal, for several reasons.   He might have been examined, if the declarations were admissible, directly as to them.   They were not admissible, because it did not appear what length of time had intervened between the killing and the declarations.   The Court had no data upon which to determine whether they were part of the *res gestæ*.   The word *immediately* is too indefinite for this.   If the question was proposed for the purpose of laying the foundation to impeach the witness, then

it was properly rejected; because such foundation cannot be laid, by invoking testimony of a witness upon a former occasion, in itself illegal.

[9.] The opinion expressed by the Juryman, *Beman*, was not such as to invalidate the verdict; because it was hypothetical. *If*, said he, *the testimony was as he had heard it, the prisoner was guilty, and would be hung*. This declaration indicates no settled conviction of his own; no passion or prejudice. It leaves the mind free to determine according to the evidence. That this is true, is sustained by the affidavit of the Juryman, who swears that he was influenced in making up his verdict, alone, by the evidence and the charge of the Court.

We regard his statement to *Mr. Harrison*, as a device to evade service on the Jury; one which is becoming but too frequent, and meriting not only censure, but in a proper case, punishment.

Let the judgment be reversed.