J. M. HERRIN AND ANOTHER v. THE STATE.

1. The common law definition of express malice as a deliberate intention of doing bodily harm to another, not authorized by law, has been adopted in former decisions of this court.

2. It is not necessary that the deliberate, premeditated intention should be formed and matured prior to the occasion at which it is carried into execution. If executed the moment it has been formed in the mind, the offense is the same as if it had existed for a much longer time.

3. Deceased and one B., while riding together on a country road, were assailed by three strangers, who rushed from the bushes, with pistols drawn, and ordered them to halt or they would shoot them. B. was unarmed, but deceased had a six-shooter pistol, which the assailing party ordered him to surrender. He refused to surrender it to them, but consented to give it to B., who, under orders from the assailants, received and placed it on the ground. B. made his escape into the bushes, and in a few minutes heard four shots in the direction of where he had left the others, and also heard a cry which he thought was in the voice of the deceased, who, a few hours afterwards, was found dead on the ground, pierced with four bullet wounds, and a short distance off his pistol was found, with two of its barrels discharged. About seventy yards from him lay one of the assailants, severely wounded by a pistol shot; but, according to B.'s testimony, this man was shot by one of his own comrades (who, by other testimony, was proved to be his brother) on a sudden quarrel arising between them while endeavoring to get deceased's pistol from him. The assailing party gave early notice of

the difficulty, and stopped at the nearest house, where they were arrested for the murder of the deceased. B. was the only witness of what transpired between the parties. *Held*, that the facts make a case against the prisoners, in which the " proof is evident or the presumption great," and there was no error in refusing them the privilege of bail; for, even if it be assumed that the deceased fired the shots missing from his pistol, yet, as the prisoners had him in their custody, and with their pistols drawn upon him, the inference is that he only acted in self-defense.

4. It is a common ruse of parties guilty of homicide to stand their ground, avow their deed, and invent some explanation to circumvent the law; but such devices should not avail, when the testimony and the circumstances make a case against them.

APPEAL on *habeas corpus* from Lamar. Heard below before the Hon. Hardin Hart.

This record presents a somewhat peculiar case of homicide. The opinion of this court sums up the conclusions from the evidence in a very clear manner, but it may be proper to develop the testimony more fully.

The principal witness for the State was William H. Bridge, who was the only person, besides the prisoners, and Irvine, the deceased, who was present at any stage of the encounter. The following was his testimony :

"My name is William Harvey Bridge. I am eighteen years old, eleventh day of last April; I live seven miles south of Paris, at my father's, James Bridge. I was at home on last Saturday morning. I left home early in the morning and came to Paris with a freedman, and got back home about one o'clock. I started from home horse hunting, about one o'clock, alone. I returned about two o'clock, and left soon afterwards and went to Mr. Armstrong's. No one was with me. I returned home from Mr. Armstrong's, and left again about half past two to go to Mr. Craft Irvine's house. I found Oliver Irvine at home alone. I started together with Oliver Irvine for Sulphur; no other person was with us ; we were going fishing and hunting.

" We were expecting to meet a fishing party, who were to leave word at Mrs. Acord's at what part of the creek they were going to fish at. We traveled on the road towards Mrs. Acord's. We got about a quarter of a mile beyond Mrs. Acord's about a half hour before sun down.

" I had no arms with me. Mr. Irvine had a Colt's dragoon pistol and no other weapon. I had six hounds and Mr. Irvine a cur dog with us, and they took after some hogs in the road. We were hallooing at the dogs to get them away, and some ones were hallooing at us; but I could not here what they said till we got the dogs stopped. They then asked us who we were; Irvine said ' friends ' and rode on; and they came out into the road behind us in a lope, and ordered us to stop or they would shoot us. We stopped, and they came up in about twenty yards, each man with a pistol in his hand. Oliver got down on the side opposite from the men. They said ' give it up,' or they would shoot him; he refused and said he would give me his pistol. The men told me to come and get it. I still sat on my horse about fifteen minutes. One ordered me to get down and get the pistol, or he would shoot me. I got down and went to Oliver, and he handed me his pistol. One of the men told me to lay it down, and I laid it down between me and Oliver, and the man put his pistol up and told Oliver he could whip him a fist fight. Another one told him to draw his pistol again and keep it cocked, or he would shoot him; but he replied ' shoot and be damned,' and the other one fired and shot him. The wounded man turned around and said he was shot and killed, and asked me if I did not do it. I told him ' no, I had no pistol,' and showed him the pistol lying on the ground. He said ' yes you did and I will kill you for it,' and drew his pistol and presented it at me, and I knocked the pistol up with my left arm and pushed him to one side, and dodged behind a tree; and he fired at me, and I run to another tree and he fired again; then I run fifty or sixty yards and he fired again. I run about thirty

yards further and stopped and looked back, and saw that he had stopped, and heard him say ' I have killed this damned rascal ; hold on to that one.' He continued to go back towards the others, and I thought he had had about time to get back to the rest. I heard four shots fire, and heard some one that I supposed to be Oliver say ' O lord ' three times, and heard nothing more till I got opposite Mrs. Acord's house, when I heard one or two horses' feet coming up the road ; seemed to be running at full speed ; and some man rode up to the fence and said there was a dead man down the road, and a conversation continued for some little time, but I could not understand what was said. I then went on home.

" I stopped on my way home, and told at the house of Mr. Ratliff, Dr. Stayton and Mr. Rogers, of the occurrence.

" I saw Oliver Irvine Saturday night, dead. His body was about fifteen feet from the place I had left him in the evening. James Smiley, Bob Stephenson, Mr. Templeton and others were present. This was in Lamar county.

" There were three men that first came up to us in the evening. They were all armed ; one had a new Colt's dragoon, one a Remington dragoon, and one a Colt's navy. They came out of the bushes on the east side, behind us.

" There was a fishing party arranged for Saturday, and I had spoken to James and George Smiley about it.

" The prisoners in court were pointed out as two of the three that attacked witness on Saturday."

There is a good deal more of this witness's testimony in the record, but it mostly consists of repetitions drawn out on cross and re-examination. He testified that he had learned since the killing that the wounded man was Abe Herrin, a brother of the prisoner J. M. Herrin, who was the person who shot him. Witness could not give any reason why these men ordered him and Irvine to halt. They came into the road fifty or sixty yards behind witness and

XXXIII—41

Irvine, and ordered them to halt immediately. Witness was not in sight of the party on the road when he heard the shooting. He left his horse on the ground and went home afoot. He was not acquainted with any of the three men. They were arrested at Mrs. Acord's about twelve o'clock the same night. The witness did not know whether the deceased's pistol was loaded or not; when found, after the killing, two of the barrels were empty.

Frederick Acord, a witness for the State, was two or three hundred yards from Mrs. Acord's house at the time of the encounter as fixed by Bridge. He heard the dogs after the hogs, and several shots which seemed to be about a quarter of a mile from where he was. He thought there were ten or twelve in all; most of them at the same point on the road, but some not exactly from the same spot as the most of them, but more to the west. The prisoner, J. M. Herrin, came to witness's house (inferred by the Reporter to be the same spoken of as Mrs. Acord's) a few minutes after the shooting, by himself, and asked for the man of the house, and witness learned from him that there was a wounded man on the road, but did not learn from him where Oliver Irvine's body was. Abe Herrin, the wounded man, was brought to the house after nine o'clock in the night, and the prisoners remained there from that time until arrested. They made no resistance to the arrest, although it appeared by the testimony that it was made without a warrant.

There is a great deal of other testimony in the record, but it relates to details attendant upon the condition and appearance of the deceased when found, and to other circumstances of no apparent importance.

The evidence used before the district judge, and found in the transcript, was that taken and reduced to writing by Esquire Samuel Long, a justice of the peace, who held an examining court and committed the prisoners to jail. His record recites that Abe Herrin, the wounded man, was not brought before him, on account

of his disabled condition, though it appears that he was included in the charge. The appellants were offered an opportunity to make a voluntary statement, but they declined doing so.

To the ruling of the district judge, refusing bail, the error assigned was, "because the evidence does not show a killing upon express malice, or under such other circumstances as to constitute murder in the first degree."

*W. H. Johnson* and *F. W. Miner,* for the appellants.

No brief for the State.

WALKER, J.—This case is an appeal from Lamar county, on a writ of *habeas corpus,* granted by the Hon. Hardin Hart, and tried before him on the application of the prisoners for bail before indictment found.

The prisoners had been previously committed to the custody of the sheriff by a justice of the peace, after an examination held on the twenty-sixth day of May, 1870, upon a complaint presented against them, charging them with the murder of one Oliver Irvine, on the twenty-first of May, 1870, and the evidence there given is that presented to us by the record.

It substantially states that the deceased, Irvine, in company with one William H. Bridge, were riding out upon a hunting excursion, when they were assailed by three men, who came from the bushes into the road, and ordered the deceased and Bridge to halt, or they would shoot them, and rode up to within a few yards of Irvine and Bridge.

The evidence discloses that two of these men were the appellants, in company with one Abe Herrin, and that they were strangers to Irvine and Bridge. Irvine carried a pistol, a revolver, and Bridge was without arms.

The advancing party demanded Irvine's pistol, and after some parley directed Bridge to take it and lay it on the ground, which

he did ; and Bridge testifies that during this time one of the appellants shot Abe Herrin, after cursing him for not keeping his pistol in his hand. The evidence of this fact is somewhat obscure, and it is not necessary for us to farther consider it, as Abe Herrin is not a party to the record, neither do the appellants stand accused of shooting him.

Abe Herrin accused Bridge of shooting at him, and pursued Bridge a short distance into the bushes, firing several shots at him without effect, when he, Herrin, abandoned the pursuit.

About this time Bridge heard four shots in the direction of the place where he had separated from Irvine and appallants, and heard a cry, which he thought that of Irvine.

Nothing more is known of Irvine until a few hours afterward, when a search was made and his dead body found lying near where Bridge had separated from him, pierced with four bullets, two of which passed through the brain.

His pistol was found by the road side, and two barrels of it empty. Some seventy yards distant, Abe Herrin, was lying wounded. Other details are given, not necessary to be here considered.

The appellants insist that the proof is not evident, neither the "presumption great," to connect them with the killing; and farther, that the evidence does not show murder in the first degree.

From the evidence in the record, we are at no loss in connecting the appellants with the homicide.

The deceased, when last seen alive, was in their custody ; they had already drawn pistols and threatened to shoot, and while the witness Bridge was still near, four shots were fired, corresponding in number with the wounds found upon the body of Irvine.

It is not shown that Irvine fired any shots at all, and if he did fire the two charges missing from his pistol, the circumstances leave the inference that it was done in self defense.

These facts are not weakened by the showing that the appellants made no effort to escape.

The many instances in which parties, guilty of homicide, act in this manner seem to induce the belief that they regard it as an atoning merit. Added to this, they not unfrequently boldly declare their murderous acts; and to their declarations, with a most diabolical cunning, add some explanation whereby to gain advantage of the law.

If the killing was murder in the first degree, the prisoners were not entitled to bail. By our statute, " all murder committed * * * with express malice is murder in the first degree."

Express malice is a deliberate intention of doing bodily harm to another, not authorized by law. · (1 Hale, P. C., 451.) This is the common law definition, and has been adopted in prior decisions of this court.

The statutes of most of the States express substantially the same meaning by the words " deliberate, premeditated killing."

Was there in this case a deliberate, premeditated design upon the part of appellants to take the life of Irvine?

The evidence shows that the violence was inflicted with deadly weapons, and in such a manner as leaves no room to doubt that death was intended; that they considered of what they would do, and then did it.

It is not shown that Irvine offered any provocation which could reduce the offense to one of inferior degree.

The attempt to get possession of Irvine's pistol had occupied some fifteen minutes, which was abundant time for the parties to reflect upon what they intended doing.

It is not necessary that the deliberate, premeditated intention should be formed and matured prior to the occasion at which it is carried into execution.

If this intention is executed the moment after it has been formed in the mind, the offense is the same as if it had existed for a much longer time. (Jordan v. State, 10 Tex. R., 479; Mitchem v. State, 11 Ga., 615; Green v. State, 13 Mo., 382.)

In a Pennsylvania case Chief Justice Lowrie said : "The deliberation and premeditation required by the statutes are not upon the intent, but upon the killing. It is deliberation and premeditation enough to form the intent to kill, and not upon the intent after it has been formed." (Keenan v. Com., 8 Wright, Pa., 56.)

Judging from such evidence as the record discloses, we think the district judge committed no error in refusing bail. The judgment is therefore affirmed.

Affirmed.