**Hosea Lorenzo WILLIAMS, Petitioner,**

v.

**Wayne MELTON, et al., Respondents.**

**Civ. A. No. C82–2437A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 9, 1983.

Tony L. Axam, Franklin, Axam & Ashburne, Atlanta, Ga., for petitioner.

Robert E. Wilson, DeKalb County Dist. Atty., Susan Brooks, DeKalb County Asst. Dist. Atty., Decatur, Ga., for respondents.

## ORDER

SHOOB, District Judge.

This habeas corpus petition filed pursuant to 28 U.S.C. § 2254 is presently before the Court on the magistrate's report and recommendation that the petition be denied. Although petitioner Hosea Williams is presently free on bond granted by the magistrate on November 10, 1982, pending a decision by this Court on his habeas corpus petition, he remains subject to serving the balance of a one-year sentence imposed by the DeKalb County Superior Court following his 1981 conviction for leaving the scene of an accident.

Petitioner challenges the validity of his conviction on the sole ground that his sixth amendment right to confrontation of the witnesses against him [1] was violated by the trial court's admission of certain hearsay statements under the *res gestae* exception to the hearsay rule. In its opinion upholding the trial court's admission of the statements, the Georgia Court of Appeals described the challenged testimony as follows:

> Two residents of the area who had proceeded to the scene immediately upon hearing the crash testified that they overheard an unidentified black male in the crowd of onlookers remark that the driver of the abandoned vehicle was Hosea Williams. A third such resident testified that he heard an unknown declarant state that the driver had been wearing a flowered shirt and "looked like" Hosea Williams.

*Williams v. State,* 162 Ga.App. 415, 415, 291 S.E.2d 732 (1982).

■ The sixth amendment confrontation clause restricts the use of otherwise admissible hearsay in two ways. First, the state must demonstrate the unavailability of the hearsay declarant; and second, where the declarant is shown to be unavailable, a hearsay statement may be used only if made under circumstances providing sufficient "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597 (1980). In the instant case petitioner does not object to the magistrate's finding that the hearsay declarant [2] was shown to be unavailable. The sole issue before the Court, therefore, is whether the circumstances surrounding the making of the hearsay statements contain sufficient "indicia of reliability" to comport with the requirements of the confrontation clause.

As already noted, the Georgia Court of Appeals held that "the trial court acted within its discretion in finding the declarations to be part of the *res gestae.*" *Williams, supra,* 162 Ga.App. at 418, 291 S.E.2d 732.[3] The state habeas court, in addressing the confrontation issue, relied on the Georgia Court of Appeals opinion in *Ewald v. State,* 156 Ga.App. 68, 274 S.E.2d 31 (1980), which was decided after the Supreme Court's decision in *Roberts, supra,* and which apparently held that statements properly admitted as a part of the *res gestae* do not violate a defendant's right to confrontation. Order on Petition for Writ of Habeas Corpus, Civil Action No. 82–6225 (Super.Ct. DeKalb Co. Aug. 9, 1982) (Fuller, J.).[4]

---

1. U.S. Const. amend. VI provides in part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." This provision is made applicable to the states by the due process clause of the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

2. The record does not establish that there was more than one declarant whose statements were overheard. The Court will, therefore, refer to the source of the statements in the singular.

3. The court of appeals did not address the constitutional question, because petitioner failed to raise that issue on direct appeal.

4. Petitioner's subsequent application for a certificate of probable cause to appeal the denial of habeas relief was denied by the Supreme

Under Georgia law the *res gestae* exception to the hearsay rule admits "[d]eclarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought. . . ." O.C.G.A. § 24–3–3 (Michie 1982). In applying the exception, the Georgia courts continue to follow the interpretation laid down in the early case of *Mitchum v. State*, 11 Ga. 615, 627 (1852): "If the declarations appear to spring out of the transaction—if they elucidate it—if they are voluntary and spontaneous, and if they are made *at a time so near to it*, as reasonably to preclude the idea of deliberate design, then they are to be regarded as contemporaneous."

In his report the magistrate points out that

[t]he Georgia *res gestae* exception to the hearsay rule appears to be an amalgamation of two well-recognized common law exceptions to the hearsay rule: the present sense impression rule and the excited utterance rule. Those two rules admit a statement if it was made concerning an event while the declarant was observing the event or under the stress of excitement caused by the event.

Report and Recommendation at 7. Noting that "[i]t has been long recognized that a statement made spontaneously while perceiving an event is sufficiently reliable to justify its admission even though it is hearsay," the magistrate found that "[t]he Georgia *res gestae* exception is a firmly rooted hearsay rule." *Id.* Following the *Roberts* Court's holding that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception," 448 U.S. at 66, 100 S.Ct. at 2539, and noting that this Court is bound by the state court's evidentiary ruling that the hearsay statements were a part of the *res gestae, see, e.g., McLaughlin v. Vinzant*, 522 F.2d 448, 450 (1st Cir.1975), the magistrate concluded that the statements bore adequate indicia of reliability, and that their admission therefore did not violate petition-

er's sixth amendment right of confrontation. *Id.* at 8.

After careful consideration, this Court has concluded that it cannot agree with the magistrate's initial premise, namely, that the Georgia *res gestae* exception is a "firmly rooted hearsay exception" within the meaning of *Roberts, supra.* In *Roberts* the Court pointed out that it had applied the "indicia of reliability" requirement "principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.'" *Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at 2539 (*quoting Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895)). The Court noted that the exceptions for dying declarations, cross-examined prior-trial testimony, and business and public records were among these "firmly rooted" exceptions. *Id.* n. 8. The *res gestae* exception, on the other hand, unlike these "firmly rooted" exceptions, has for many years been the object of severe criticism from both commentators and courts because of its vagueness and imprecision.

More than sixty years ago, one commentator inveighed against continued recognition of the exception in the following terms:

The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as "res gestae". It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking.

Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229 (1922). And even before the turn of the century, the Supreme Court of Georgia itself "eschewed anything so impractica-

---

Court of Georgia on October 27, 1982. The

instant petition was filed on November 9, 1982.

ble" as a precise definition of the *res gestae:*

> The difficulty of formulating a description of the res gestae which will serve for all cases, seems insurmountable. To make the attempt is something like trying to execute a portrait that shall enable the possessor to recognize every member of a numerous family.

*Cox v. State,* 64 Ga. 374, 410 (1897). More recently, an observer of the Georgia rule concluded that "[t]he confusion gets further compounded with each new attempt to explain 'what *res gestae* really means,'" and insisted that "[t]here is no remedy except to banish irrevocably this insidious phrase from our legal vocabulary." Harper, *Res Gestae in the Georgia Law of Hearsay,* 5 Mercer L.Rev. 257 (1954). Finally, since the Court is concerned here with a question of federal constitutional law, it is significant that the Federal Rules of Evidence reject a *res gestae* exception to the general hearsay exclusion in favor of more specifically delimited exceptions for present sense impressions, excited utterances, and then existing mental, emotional or physical conditions. *See* Fed.R.Evid. 803(1)–(3).

■ In light of the vagueness and imprecision of the *res gestae* exception, this Court declines to hold that any evidence admitted under this exception in accord with state evidentiary law necessarily comports with the requirements of the sixth amendment confrontation clause. Rather, as mandated by *Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at 2539, this Court holds that such "evidence must be excluded . . . absent a showing of particularized guarantees of trustworthiness."

Accordingly, the Court now turns to an analysis of the particular circumstances surrounding the challenged hearsay testimony admitted in the instant case to determine whether there existed sufficient guarantees of trustworthiness to meet federal constitutional requirements. The Court is guided in its analysis by the plurality opinion in *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970), where Justice Stewart wrote "that the mission of the Con-

frontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" (*Quoting California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)).

■ In *Dutton, supra,* 400 U.S. at 88–89, 91 S.Ct. at 219, Justice Stewart applied the following criteria in determining that an out-of-court declaration of a co-conspirator had sufficient indicia of reliability for admission into evidence:

> First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it.

Using the *Dutton* criteria as a framework for analysis, and after a careful review of the entire trial transcript, this Court is ineluctably drawn to the conclusion that the hearsay statements admitted at trial over petitioner's objection did not bear sufficient indicia of reliability to meet the constitutional standard.

First of all, unlike in *Dutton,* the challenged statements in the instant case were express assertions of past fact. Although the state court's evidentiary ruling that the

statements were part of the *res gestae* implies that they were legally deemed to have been uttered contemporaneously with the facts asserted therein, this does not alter the reality reflected in the trial testimony that the statements were actually made between ten and fifteen minutes *after* the events described had occurred. Thus, Mr. Robert Steve testified that about ten or fifteen minutes had elapsed after the accident when an unidentified black man who was in the crowd that had gathered remarked to him and several of the other bystanders that "the guy that was driving that car ... looked just like Hosea Williams," that this man who looked like Williams "went over and looked at him [the injured driver of the other car] and [then] went down the street," and that "[h]e had on a flowered shirt" (T–46, 50, 56). Mrs. Addie Harkness also testified that it was ten or fifteen minutes after the accident that she overheard an unidentified black male state that it was Hosea Williams who had been driving the abandoned car (T–62, 64). Finally, Mr. Horace Epperson, while not indicating the specific amount of time that had elapsed, testified that some time after the accident, while he and other bystanders were attending to the injured driver, an unidentified black man

> comes up and says, "Do you know who hit you, Brother?" And the guy says, "No." He is sitting there like this, you know. He said, "Hosea Williams." And at that time he stood around there for two or three minutes and then just melted into the crowd.

(T–74).

Second, there was no evidence whatsoever of the hearsay declarant's personal knowledge of the identity of the driver of the abandoned car.[5] In fact, testimony elicited by defense counsel on his cross-examination of Travis J. Vanlaeys, a DeKalb County deputy sheriff who was the first law enforcement officer to arrive at the scene of the accident (T–179), established that the declarant's "knowledge" might have been based on an overheard conversation between Vanlaeys and DeKalb County police officer C.A. Jones. Vanlaeys testified that shortly after his arrival he and Jones searched the abandoned car while onlookers stood by within a distance of twenty to twenty-five feet, and that upon discovering correspondence addressed to and from petitioner, Jones "said something like 'Look at this, Hosea Williams' [and] I said 'Hosea Williams?' " (T–209). Paraphrasing *Dutton, supra,* 400 U.S. at 88–89, 91 S.Ct. at 219, under these circumstances it is certainly conceivable that cross-examination could have shown that the hearsay declarant was not in a position to know whether or not petitioner Williams was involved in the accident.

Third, although the possibility that the hearsay declarant's statements were founded on faulty recollection is perhaps remote given the relatively short time interval be-

---

5. *Cf. McLaughlin, supra,* 522 F.2d at 451, where the hearsay evidence was admitted under the state's spontaneous utterance exception:

> It is true that there is no evidence of precisely where Dellamano [the hearsay declarant] was and what events she witnessed leading her to announce that McLaughlin [petitioner] had shot Sheridan. But, it was permissible to draw an inference not only from the force of the statement itself but from the fact that she was accompanying McLaughlin and was somewhere in the immediate vicinity of the fatal event, that she possessed firsthand knowledge of the killing. *See* McCormick on Evidence § 297 at 705 (2d ed. 1972).

Just as in *McLaughlin,* there is no evidence in the instant case of precisely where the hearsay declarant was or what events he witnessed that led him to make the statements later testified to by the three nearby residents. Unlike *McLaughlin,* however, there is also nothing from which one could infer that the declarant was speaking from firsthand knowledge, other than the content of the statements themselves. There is no evidence of where the declarant came from, when he arrived on the scene, or whether he witnessed the accident at all. Unlike other cases, such as *McLaughlin,* where admission of hearsay testimony has been upheld, in the instant case literally *nothing* is known about the declarant except that he made certain statements implicating petitioner in a crime "and then just melted into the crowd [T–74]." The use of such anonymous accusations of wrongdoing is precisely the sort of evil that the confrontation clause was intended to prevent.

tween the accident and the time the statements were made, the complete absence of an opportunity to cross-examine left unexplored the mental state of the declarant at the time of his statements. The defense thus had no opportunity to investigate possible drug or alcohol intoxication, or other mental condition, which could have affected even very short-term memory.

Fourth, and finally, even accepting, as this Court must, the state court's determination that the statements were part of the *res gestae,* the totality of circumstances under which the statements were made does not give adequate assurance that the declarant was without motive or opportunity to deliberately misrepresent petitioner's involvement in the accident. Petitioner's long and controversial career in public affairs has undoubtedly garnered him many enemies. Moreover, if in fact petitioner was not the driver of the abandoned car, then one person with clear motive and opportunity to lie about his involvement would have been the person who *was* the driver. Nothing in the evidence presented at trial negates the possibility that the hearsay declarant himself might have been the driver of the "abandoned" car seeking to deflect suspicion from himself to petitioner, whose car he had stolen.

The foregoing analysis has led this Court to the conclusion that the challenged hearsay statements do not bear sufficient indicia of reliability to withstand scrutiny under the confrontation clause. It is clear beyond doubt that in the absence of cross-examination, and without an opportunity to observe the declarant testifying under oath, "the trier of fact [was denied] a satisfactory basis for evaluating the truth of the [hearsay] statement[s]." *Green, supra,* 399 U.S. at 161, 90 S.Ct. at 1936. Accordingly, the Court concludes that the admission of the hearsay testimony over petitioner's objection was a violation of his sixth amendment right to confront the witnesses against him.

■ This Court's determination that a constitutional error has been committed, however, is not the end of the required analysis. "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). In determining whether a constitutional error is harmless, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827 (*quoting Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963)). In a recent case, the Supreme Court stated the test this way: "The question a reviewing court must ask is this: absent the [admission of the hearsay statements], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting,* —— U.S. ——, ——, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (*citing Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969)). Although this Court is uncertain whether the *Chapman* and *Hasting* statements of the applicable standard are entirely consistent, *cf. Harrington, supra,* 395 U.S. at 255, 89 S.Ct. at 1729 (Brennan, J., dissenting) (*Harrington* "overrules" *Chapman* ), under either formulation there is no doubt that the error in this case was not harmless to petitioner.

It is true that the state presented substantial circumstantial evidence that petitioner was the driver of the abandoned car. Law enforcement officers who arrived on the scene shortly after the accident searched the car and found various documents addressed to and from petitioner Williams, as well as a Hertz rental agreement for the vehicle in Mrs. Williams's name (T–121–22). Approximately thirty minutes after the accident petitioner was arrested near the Bingo Palace, a business establishment operated by him and located within a mile of the scene of the accident (T–185–91; 197). Petitioner was wearing a flowered shirt, was somewhat disheveled, and had a cut over his right eye. *Id.*

Later, at the police station, a briefcase containing some $1,400.00 in receipts from the Bingo Palace was removed from the car trunk and claimed by petitioner (T–241–45). A plastic bag of tomatoes was also found in the car, *id.,* and a customer at the Bingo Palace on the night of the accident testified that she gave petitioner a plastic bag of tomatoes that night and later saw him take the tomatoes and his briefcase and head for the front door of the Bingo Palace just before 8:00 PM (T–102).

With regard to the cut on petitioner's forehead, Larry J. White, an accident specialist with the DeKalb County Police Department, testified that the rearview mirror in the abandoned car had been broken off the windshield and cracked on the left side. According to White, petitioner's wound and the broken mirror were consistent with the probable pattern of impact on the driver of the abandoned car (T–232–38).

Petitioner, on the other hand, also put forward circumstantial evidence in support of his position that the car had been stolen shortly before the accident and was being driven by the unknown thief when the accident occurred. The general manager of the Bingo Palace testified that she had put the tomatoes and money in the car and may have inadvertently left the keys in the trunk lock (T–279–83). She and both of Williams's sons testified that he was at the Bingo Palace between 8:00 and 9:00 PM on the night of the accident (T–283, 337–38, 365). One of the two sons also described the cut over petitioner's eye as just a scratch (T–382), although a nurse at the jail who examined the wound testified that she told petitioner it would require about five stitches to close (T–171–73). Petitioner himself testified that he was working at the Bingo Palace the night of the accident and cut his head on the jagged edge of a door in

a back storage room (T–434–35, 478–79). He further testified that he had left the Bingo Palace only to go to a nearby convenience store for a band-aid, and it was then that he was arrested (T–435–36).

This brief review of the evidence is sufficient to point up the most significant factor concerning the improperly admitted hearsay statements, namely, that they constituted the *sole* direct evidence placing petitioner at the scene of the accident. *Cf. Harrington, supra,* 395 U.S. at 254, 89 S.Ct. at 1728 (petitioner's presence at scene of crime was established by other direct evidence, so that hearsay evidence was merely "cumulative"). This Court certainly is not convinced beyond a reasonable doubt, as it must be before holding that a constitutional error was harmless, that there is no reasonable possibility that this unique evidence of such a damaging nature contributed to the conviction of petitioner.[6] Paraphrasing *Hasting, supra,* —— U.S. at ——, 103 S.Ct. at 1980, absent the admission of the hearsay statements, it is *not* clear beyond a reasonable doubt that the jury would have returned a verdict of guilty.

On the contrary, in this Court's view, the improperly admitted hearsay evidence to the effect that some ten to fifteen minutes after the accident an unidentified black man was overheard to say that Hosea Williams was the guilty party "and then just melted into the crowd" (T–74), was the linchpin of the state's otherwise purely circumstantial case. Absent this evidence, the jury would have been required to weigh more carefully the parties' conflicting theories of the available evidence, with the attendant need to judge the credibility of the various witnesses, in order to reach an ultimate determination of guilt or innocence. This Court cannot, under these circumstanc-

---

**6.** Indeed, the jury's request that the Court reinstruct them on the meaning of *"res gestae"* suggests that the hearsay evidence may very well have been at the focus of their deliberations. Moreover, in response to the request, the trial judge charged the jury, *inter alia,* "that statements made at the scene of a crime may be admitted at trial as original evidence where shown that they are contemporaneous, volun-

tary and made at a time which indicates the lack of deliberation and deception and freedom from all suspicion of device or afterthought" (T–556). In this Court's view, this charge improperly emphasized the trial judge's finding that the evidence was trustworthy and therefore may have caused the jury to give the evidence undue weight in its deliberations.

es, presume to know beyond a reasonable doubt what that determination would have been.[7]

Accordingly, the Court having held that petitioner was denied his sixth amendment right to confront the witnesses against him, and that this error was not harmless, the petition for writ of habeas corpus is hereby GRANTED. However, the writ's mandate is SUSPENDED for a period of 90 days to afford the state an opportunity to retry petitioner. The magistrate's bond shall remain in effect during this period. If the state does not retry petitioner within 90 days, petitioner shall be DISCHARGED from any further incarceration pursuant to his conviction in the Superior Court of De-Kalb County, Georgia, on April 21, 1981.

7. The apparently contradictory testimony of Barbara Golden concerning the taking of certain photographs, which the defense introduced to prove that petitioner's head wound was only superficial, was certainly damaging to petitioner's case. However, even though Ms. Golden later pled guilty to perjury, this Court cannot rely on that contradictory testimony to discredit petitioner's entire defense and thereby reach the conclusion that the constitutional error was harmless. All of this would simply go to the credibility of Ms. Golden and petitioner himself, and where a verdict depends on such credibility determinations, the case is not one in which a reviewing court is competent to determine that a guilty verdict was inevitable and any error therefore harmless.