**Ronald Raymond BOONE, Petitioner,**

v.

**Ronald C. MARSHALL, Respondent.**

**No. C-3-83-1150.**

United States District Court,
S.D. Ohio, W.D.

June 6, 1984.

Ellis Jacobs, Dayton, Ohio, for petitioner.

Christine Manuelian, Wendy Wonnell, Asst. Attys. Gen., Columbus, Ohio, for respondent.

## DECISION AND ENTRY DENYING PETITION FOR WRIT OF HABEAS CORPUS; TERMINATION ENTRY

RICE, District Judge.

The captioned cause comes before the Court upon petition for writ of habeas corpus, by a person in state custody, filed pursuant to 28 U.S.C.A. § 2254. For the reasons set forth below, the Court denies the petition for a writ and dismisses the petition in its entirety.

## I. BACKGROUND

At Petitioner's bench trial on charges of aggravated burglary, aggravated robbery and aggravated murder, the trial court admitted testimony concerning statements made by Petitioner's brother, John Boone, an out-of-court declarant and a party to the incident on trial, which implicated Petitioner as the murderer of the decedent. *See,* e.g., Trial Transcript (Tr.) at 108, 147 and 175.

The trial court convicted Petitioner on all three counts. (Tr. 372–73).

■■■ The Court of Appeals of Montgomery County, Ohio, Second Appellate District, affirmed Petitioner's conviction. *State v. Boone,* No. 7516, slip op. (Ohio Ct.App. Montgomery Co. March 4, 1983). Although the appellate court concluded that the admission of John Boone's statements fell within the co-conspirator exception to the hearsay rule, *id.* at 11, the appellate court held that the trial court erred in admitting testimony regarding these statements. Applying the two-pronged test of Confrontation Clause violations announced in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), the appellate court determined that the state had failed to prove John

Boone's unavailability[1] and that John Boone's statements lacked adequate indicia of reliability. *State v. Boone*, No. 7516 at 13. Therefore, held the court, constitutional error had intervened as Petitioner was denied his Sixth Amendment Confrontation Clause rights. *Id.* at 15.[2]

Citing the tests used in *Fahy v. Connecticut*[3], 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963), *Chapman v. California*[4], 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Harrington v. California*[5], 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), the appellate court concluded that it believed that the admission of John Boone's hearsay statements constituted harmless error. The appellate court noted that "[t]he appellant admitted he killed the victim to both Scott Patterson and Orville Green [witnesses at Petitioner's trial who provided the testimony concerning John Boone's state-

ments]. His shoe print was left at the murder scene. Blood was found on the money recovered from appellant on the day of the crime." [6] *State v. Boone*, No. 7516 at 15–16.

The Court of Appeals of Montgomery County, Second Appellate District, denied Petitioner's motion for reconsideration of its decision. *State v. Boone*, No. 7516, slip op. (Ohio Ct.App. Montgomery Co. March 24, 1983), and the Ohio Supreme Court dismissed *sua sponte* Petitioner's appeal for the lack of a substantial constitutional question. *State v. Boone*, No. 83–760 (Ohio June 29, 1983).

Petitioner seeks review in this Court of his conviction for aggravated murder on the grounds that the admission of John Boone's statements constituted constitutional error that was not harmless. (Doc. # 14). Respondent denies that the admis-

---

**1.** The appellate court noted that a demonstration of an out-of-court declarant's unavailability was not required when the proffered testimony concerning the out-of-court declarant's statements was not "crucial or devastating", was of "peripheral significance at most" and the possibility of unreliability of the statements was "wholly unreal." *State v. Boone*, No. 7516 at 14 *citing Dutton v. Evans*, 400 U.S. 74, 87, 89, 91, 91 S.Ct. 210, 219, 220, 221, 27 L.Ed.2d 213 (1970). The appellate court characterized Orville Green's testimony, concerning John Boone's statements, as " 'crucial' because it directly implicated appellant as the decedent's murderer." *State v. Boone*, No. 7516 at 14. Accordingly, the appellate court concluded that John Boone's statements did not fall within the exception to the demonstration of unavailability requirement, i.e., that the prosecutor, therefore, did have to demonstrate the "unavailability" of the witness. *Id.*

**2.** Strictly speaking, co-conspirator statements, admissible under Ohio Rule of Evidence 801(D)(2)(e), are deemed *not* hearsay, rather than an *exception* to the hearsay rules. However, whether the complained of statements are admissible as non-hearsay co-conspirator statements, whether the statements are admissible under the excited utterance exception to the hearsay rule (Tr. 348), or whether the statements are inadmissible under any theory, this Court agrees with the state appellate court that the Confrontation Clause was violated. The issue herein, therefore, is whether the constitutional error was harmless beyond a reasonable doubt.

**3.** In reviewing a constitutional error under the test announced in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), the appellate court stated that such error is harmless if there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Boone*, No. 7516 at 15 *citing* 375 U.S. at 86–87, 84 S.Ct. at 230–231.

**4.** The appellate court cited *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) for the proposition that "[b]efore a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt." *State v. Boone*, No. 7516 at 15, *citing* 386 U.S. at 24, 87 S.Ct. at 828.

**5.** The appellate court phrased the test in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) as not " 'whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of, but whether the evidence complained of may have influenced the fact-finder's deliberations'." *State v. Boone*, No. 7516 at 15 *citing* 395 U.S. at 254, 89 S.Ct. at 1728.

**6.** The Court notes that the trial court excluded exhibits containing the stained currency. (Tr. 340–41) However, defense counsel did not move to strike the testimony of the criminalist (concerning the exhibits) who reported that preliminary crime lab tests indicated that the stain on the money was blood. (Tr. 297).

sion of the testimony violated Petitioner's Confrontation Clause rights, and Respondent further argues that, even if the trial court erred in admitting the testimony, such error was harmless. (Docs. # 9 and 15).

 Since this Court agrees with the state appellate court, based upon the reasoning and citations of authority contained in the appellate court opinion, that Petitioner's Sixth Amendment right of confrontation was violated by the trial court's admission of the testimony at issue herein, the general question, faced by this Court, therefore, is whether this error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. at 24, 87 S.Ct. at 828, *United States v. Robinson,* 716 F.2d 1095, 1099 (6th Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 722, 79 L.Ed.2d 183 (1984), *Raper v. Mintzes,* 706 F.2d 161, 164 (6th Cir.1983).[7]

## II. HARMLESS ERROR TESTS

 In order to determine whether the testimony admitted in error was harmless beyond a reasonable doubt, the Court applies the tests announced by the Supreme Court. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court stated that " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " 386 U.S. at 23, 87 S.Ct. at 827 *citing Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963). Recently, the Supreme Court described this question as the "essence of the harmless error doctrine." *United States v. Hasting,* 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76

L.Ed.2d 96 (1983). However, the Court in *Hasting* then announced that "[t]he question a reviewing court must ask is this: absent [the complained of practice], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" 461 U.S. at 510, 103 S.Ct. at 1981.[8]

Following the method used by other courts in answering the questions posed by the Supreme Court in *Chapman* and *Hasting,* this Court does not attempt to read the mind of the finder of fact, but rather the Court reviews in detail the trial court record, emphasizing the evidence adduced at trial. *See, United States v. Hasting,* 461 U.S. 499, 103 S.Ct. at 1981–82; *Chapman v. California,* 386 U.S. at 24 and 26–42, 87 S.Ct. at 828 and 829–836; *Fahy v. Connecticut,* 375 U.S. at 87–92, 84 S.Ct. at 230–233; *Alston v. Garrison,* 720 F.2d 812, 817–18 (4th Cir.1983), *petition for cert. denied,* —— U.S. ——, 104 S.Ct. 3589, 82 L.Ed.2d 886 (1984).

## III. TRIAL COURT RECORD

A review of the trial transcript reveals the following:

Just after midnight on May 20, 1981, while riding with John and Luke Boone and Orville Green in a car driven by Scott Patterson, Petitioner (Ronald Boone) told his fellow passengers of a place they could break into. Petitioner stated that the occupant of the house was an 87 year old man who had a hearing aid. (Tr. 92–94). After Patterson secured tools that Petitioner requested (a flashlight and wire cutters), he drove the group to a house on Findlay Street in Dayton, Ohio, following Petitioner's directions. (Tr. 97). In the alley be-

---

**7.** The Court notes that the burden falls on the *prosecution* to demonstrate that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. at 24, 87 S.Ct. at 828; *United States v. Robinson,* 716 F.2d at 1099; *Raper v. Mintzes,* 706 F.2d at 164. The Court also notes that its duty as a reviewing court is to consider the trial record as a whole. *United States v. Hasting,* 461 U.S. 499, 508, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983); *United States v. Bostic,* 713 F.2d 401, 403 (8th Cir.1983).

**8.** Both the *Chapman* and *Hasting* tests require the reviewing court to focus on the effect the error had on the jury and not merely on the sufficiency of the evidence, absent the complained of evidence, to sustain the conviction. *See Fahy v. Connecticut,* 375 U.S. at 86, 84 S.Ct. at 230. *United States v. Hasting,* 461 U.S. at 510, 103 S.Ct. at 1981; *United States v. DeRobertis,* 568 F.Supp. 1484, 1486 n. 4 (N.D.Ill.1983); *United States v. Doamarel,* 567 F.Supp. 254, 263 (D.Del.1983).

hind the house, John Boone and Petitioner got out of the car; Patterson continued to drive (Tr. 99). After approximately 25 minutes, Patterson returned to the corner of the alley where he saw Petitioner who requested something with which to break a window. Patterson gave Petitioner a tire iron. After another 25 minutes had elapsed, Patterson saw John Boone in the alley in a hysterical, upset state. (Tr. 99–100). John joined the others in the car, and, after 15 minutes, the group returned to pick up Petitioner who had with him a flashlight, the pliers, the tire iron that Patterson had earlier provided, and some change. (Tr. 102–106).

At Petitioner's bench trial, Patterson testified that Petitioner, after returning to the automobile, told him that "he [Petitioner] hit the old man once and knocked him down and put his foot on his chest to keep the man from getting up, ... but his [Petitioner's] brother told me different." (Tr. 107). Following an overruled objection to this testimony, Patterson stated that John Boone "said he [John Boone] checked the man's carotid artery and the man had no pulse and the man was dead when he left the house. Ron proceeded to say he listened to the man's heart and the man was alive when he left the house." Patterson further testified that "[a]nd after that, it was talked about John said that the man-proceeded to keep insisting that the man was dead and I asked Ron, 'Why did you do it?'. He [Ron] said, 'Because I had to because I didn't want no witnesses.'" (Tr. 108).[9] Patterson later repeated that Petitioner said he did not want any witnesses and that he (Petitioner) was ready to get off probation and did not want to "screw it up." (Tr. 110 and 112). During cross-examination of Scott Patterson, the following colloquy took place:

Q. You indicated that Ronald [Petitioner] said he had to kill this person because of witnesses; is that correct?

A. That's correct. (Tr. 126).

Patterson also described an oath the parties made after the incident. He testified that "[we] said that the guy was not dead. We can get out of this okay, and we were going to come and stay away from crime and go to church more often and get closer to God." (Tr. 133) When asked whether he still believed that the man might have been alive at the time the parties made the oath, considering Petitioner's statement that he [Petitioner] didn't want any witnesses to be left, Green responded, "Ron said the man was alive when he left the house and Ron's brother said he was dead." (Tr. 134).

Orville Green also testified at Petitioner's trial. After chronicling the events of May 20 in much the same fashion as Scott Patterson had reported them, Green, following an overruled objection (on the basis of Ohio Rule of Evidence 803[2]), testified in the following manner on direct examination:

Q. Did Ron say anything? I'm sorry, John, say anything [before Ron returned to the car]?

A. Yes, he did. He proceeded on telling us how this old man, elderly man was killed.

Q. Did he indicate by whom?

A. Yes, he did.

Q. By whom?

A. Ronald Raymond Boone. (Tr. 147)

Green later testified that the Petitioner "said, 'I had to because I am already facing five to,' he said five years in the Ohio State Penitentiary. 'I didn't need no witnesses.'" (Tr. 150). In response to the direct examiner's request for the details of the conversation between Green and Petitioner immediately before the Petitioner's statement about witnesses, Green answered, "I can't remember." (Tr. 150). The following exchange then took place:

---

**9.** The trial court overruled the hearsay and Fifth Amendment objection on the basis of Ohio "Evidence Rule 801, subparagraph[s] (1) and (2)." (Tr. 109). These sections provide that prior statements by a witness and admissions by a party-opponent are not hearsay. *See* Ohio Rules of Evidence 801(D)(1) and (2).

Q. Now, as best you can, what was (sic) the exact words that he said to you?

A. About the killing?

Mr. Beemer (Counsel for Petitioner): Objection. Asked and answered.

Mr. Slavens (Prosecutor): About the old man.

The Court: Sustained. (Tr. 150–151).

Green also testified that Petitioner indicated that he (Petitioner) got money from an upstairs bedroom, but that he (Petitioner) did not specify from which bedroom the money came. (Tr. 151)

During cross-examination of Green, the following transpired:

Q. Now, you have indicated that Ronald told you he had killed a man because he wanted no witnesses; is that correct?

A. Yes, he did. (Tr. 174)

After Patterson testified that Petitioner threw money at him in the car, the following exchange took place during cross-examination of Patterson:

Q. Didn't you make the statement you didn't care if the old man was dead? You just wanted to know if he was holding out on you?

A. Yes, I had said that.

Q. You were mad at Ron weren't you?

A. Yes, I was.

Q. You were mad because he was holding out money?

A. *Was mad because he killed an older person,* man.

Q. How do you know that?

A. *It just the way he acted, the way John told me.*

Q. Okay.

A. *The things that he stated.*

Q. Now, Ron had said that when he left the house the man's heart was still beating. Didn't he tell you that?

A. Yes, he did state that.

Q. Yourself and Scott Patterson and Ron swore to God you would make a pact if you got out of this and the man was okay you would go straight, isn't that true?

A. That's right.

Q. You thought at least the man might not be dead?

A. That's true. I wasn't following one way or the other. I didn't see it. (Tr. 175–76) (emphasis added)

At approximately 6:40 a.m. on May 20, the police entered the Findlay Street residence. There Police Officer Robert Barnard discovered the body of the deceased, Simon Glasscock, lying on the floor of the upstairs *northwest* bedroom. (Tr. 198) At the entrance to this bedroom, Officer Barnard observed that part of the wooden door was chipped or pried near the doorknob, and there was splintering near the door lock. (Tr. 199). On the floor of the *northwest* bedroom, the officer saw a drawer, fan, plastic bag and clothing. "The top of the mattress [lay] on its side by the bed and a dresser with a drawer open," Barnard said. (Tr. 205) Officer Barnard also found a shoe print in dust on the wooden floor of the upstairs *northeast* bedroom. (Tr. 201). A visual comparison of Petitioner's shoes and the shoe print served as the cause of Petitioner's arrest. (Tr. 235–36).

John Welsh, Assistant Coroner for Montgomery County, testified at Petitioner's trial that the autopsy of decedent's body revealed the following: 1) very small multiple hemorrhages around the eyes indicating a type of constriction of blood vessels particularly in the neck and commonly seen in cases of strangulation, hanging or airway obstruction; 2) multiple bruises on the head and neck; 3) deep lacerations of the right outer ear and the presence of blood within the external canal of the right ear; 4) bleeding from the right nostril; 5) contusive injuries about the upper lip; 6) abrasions and bruises on the arms; 7) laceration of the liver; 8) multiple fractures of the left ribs; 9) a fractured skull; and 10) hemorrhaging throughout the soft tissue in the neck (Tr. 259–75). In the Assistant Coroner's opinion, the decedent died from deprivation of oxygen to his brain resulting in acute respiratory failure. These condi-

tions occurred as a result of blunt force trauma, Welsh concluded. (Tr. 278). After an overruled objection, the Assistant Coroner opined that the decedent suffered a severe beating. (Tr. 279).

Preliminary crime lab tests performed on bills taken from the Petitioner's wallet when he was taken into custody (Tr. 304–07) indicated that a stain on at least one $10 bill was blood. (Tr. 297). The criminalist who testified to the test results, however, further explained that "[there] simply is not enough stain material there to determine where the blood was, how much or not or to confirm, absolutely confirm, the presence of blood." (Tr. 297). On the basis of doubts about the search and seizure that produced the currency as well as doubts about the probative value of the exhibits containing the stained bill(s), the trial court excluded them from admission. (Tr. 340–341).

In supporting his motion for acquittal, defense counsel, referring to John Boone's statements, argued that "[t]here was an opportunity for the state to present evidence from the person of another who may or may not have been present when some of the acts were allegedly committed. This was not done." (Tr. 345) Defense counsel also stated that "we have not abandoned our former objection to the testimony of Scott Patterson and Orville Green we have previously postulated to the court, and we further submit there are even superior reasons why the Court should reject what Scott Patterson and Orville Green have espoused from the witness stand in the previous two days." (Tr. 345–46).

In overruling the Petitioner's motion for acquittal [10], the trial court stated in part the following:

> ... In particular, counsel for Defendant addressed the subject of statements which the Court permitted to be made of John Boone as being hearsay, and, therefore not properly admissible and certainly not enough to in itself support the overruling of this motion.
>
> During the course of trial, of course, the Court permitted the testimony under Evidence Rule 803 Subsection 2, what is commonly designated as the excited utterance exception to [the] hearsay rule. In further reflection, there is a serious question in the Court's mind as to whether this is even hearsay. Under Evidence Rule 803—I'm sorry—under Evidence Rule 801(D)(2)(e)—that completes the reference—the status of the record by direct evidence would support a finding that there was, in fact, a conspiracy involved among the five participants shown by the evidence. In addition, there was an overt act or overt acts and, therefore, the Court has entertained serious question as to whether or not those statements by John Boone were even hearsay under Evidence Rule 801, but even assuming for the purpose of this decision that these statements were hearsay, the Court is still of the conviction that it would be within the exception set forth in 803 Subsection 2, excited utterances.
>
> The defendant's position is that the elements were not established even prima facie.
>
> Looking first to the Count Two charge, that being aggravated murder, the testimony of the witnesses, Patterson and Green, particularly the statements attributed to the defendant, amply support the purposely element. This is corroborated by the testimony of Dr. Welsh in distinguishing the magnitude and multiplicity of the serious injuries which were inflicted upon the decedent.
>
> . . . .
>
> [W]e again have the statement attributed to the defendant—I think I'm nearly quoting, "I had to kill him. I couldn't leave no witnesses." This is perhaps, if not a direct quote, substantially correct,

---

**10.** Ohio Rule of Criminal Procedure 29(A) provides that "[t]he court on motion of a defendant ..., after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment ..., if the evidence is insufficient to sustain a conviction of such offense or offenses."

but superimposed upon that, of course, is the testimony of Dr. Welsh that these injuries inflicted did result in the death of the decedent and also the circumstantial evidence of the design to break into the house, to obtain money and to return to the vehicle involved to obtain tools to not only gain access, but as it turns out, can be reasonably inferred that the tool or tools were used in causing the death of Mr. Glasscock. (Tr. 347–49).

Without introducing any evidence, Petitioner rested after the trial court's ruling on the motion for acquittal. (Tr. 351).

During his closing argument, defense counsel again noted the hearsay nature of the testimony offered by Orville Green and Scott Patterson concerning statements made by John Boone (Tr. 362). Defense counsel cited to the trial court the case of *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1964), for the proposition that the Confrontation Clause provides the Petitioner with the privilege to confront his accusers, herein, John Boone. (Tr. 363–64). After the trial court overruled the prosecutor's objection that defense counsel could have called John Boone and that defense counsel's argument was improper, Petitioner's attorney proceeded to raise questions that, in his opinion, John Boone could have answered, had John Boone been called as a witness. These questions included the following: 1) Were you (John Boone) wearing shoes that night? 2) Was Petitioner ever in the *northwest* bedroom of Mr. Glasscock's residence? 3) Did you (John Boone) make those statements? 4) What did you (John Boone) see? (Tr. 364)

Defense counsel again referred to the failure of John Boone to testify as he ended his closing argument. (Tr. 368)

The prosecutor, in final argument, observed that the Petitioner has a right to subpoena witnesses such as John Boone, brother of the Petitioner (Tr. 369).

In announcing its verdict of guilty on all three counts, the trial court distinguished *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) from the Petitioner's case. The trial court stated that:

The witness about whom they were speaking in the Supreme Court case was not subject to compulsory process. The witness to which the defendant [Petitioner] alludes was subject to compulsory process in this case. [Thus, either side could have called John Boone.] That and a number of other reasons I won't belabor, I feel makes the case clearly distinguishable upon its facts. (Tr. 372–73).

## IV. HARMLESS ERROR ANALYSIS

In order to decide whether the constitutional violation at issue herein constituted harmless error beyond a reasonable doubt, this Court analyzes the evidence and the trial record, as summarized above, pertaining to Petitioner's conviction for aggravated murder under the tests set forth in *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828, *citing Fahy v. Connecticut*, 375 U.S. at 86–87, 84 S.Ct. at 230–231, and *United States v. Hasting*, 461 U.S. at 508, 103 S.Ct. at 198.

■ With regard to whether there is no "reasonable possibility that the evidence complained of might have contributed to the conviction", *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828, *citing Fahy v. Connecticut*, 375 U.S. at 86–87, 84 S.Ct. at 230–231, this Court looks to the remarks made by the trial court when it overruled defense counsel's motion for an acquittal. The trial court expressly determined that either John Boone's statements were not hearsay under the co-conspirator exception to the hearsay rule, as provided by Ohio Rule of Evidence 801(D)(2)(e), or, alternatively, that the statements fit within the excited utterance exception to the hearsay rule, Ohio Rule of Evidence 803(2). (Tr. 348). The trial court also alluded generally to the testimony of witnesses Patterson and Green in considering the aggravated murder charge (Tr. 348). The defense presented no evidence after the court ruled on the motion for acquittal. Not only do these two references made by the trial court indicate a "reasonable possibility that the evidence complained of might have con-

tributed to Petitioner's conviction," 386 U.S. at 24, 87 S.Ct. at 828 *citing* 375 U.S. at 86–87, 84 S.Ct. at 230–231, but also the admission of the disputed testimony, in spite of defense counsel's repeated objections to it, (Tr. 108–109, 345 and 362), *demonstrates the improbability that the testimony did not contribute to the verdict of guilty.* Accordingly, this Court concludes that the constitutional error complained of by Petitioner did *not* constitute harmless error beyond a reasonable doubt under the *Chapman* test. However, the analysis does not end here. This Court must also answer the *Hasting* question on the basis of a review of the trial court record. In determining whether, absent the complained of testimony, it is clear beyond a reasonable doubt that the trier would have returned a verdict of guilty, *United States v. Hasting*, 461 U.S. at 510, 103 S.Ct. at 1981, the Court refers to the following evidence:

1) Petitioner returned to the car after the incident with tools that earlier he had taken from Patterson. (Tr. 100, 102–06). Decedent's injuries, sustained during his murder, (Tr. 278), were consistent with the use of these tools in inflicting blunt force trauma on the decedent. (Tr. 349).

2) Petitioner told Patterson and Green that he killed the decedent.[11] (Tr. 126, 174)

3) Petitioner's shoe print was found in an upstairs bedroom (albeit not the same bedroom in which decedent's body was found) of decedent's residence. (Tr. 201, 235–36). Petitioner's statement to Green indicating that money in Petitioner's possession had come from an unspecified upstairs bedroom (Tr. 151) also placed Petitioner on the second floor of the house.

4) The stain (identified as blood in preliminary testing) found on the $10 bill taken from Petitioner's wallet further implicated Petitioner. (Tr. 297).[12]

■ On the basis of this evidence, this Court believes, beyond a reasonable doubt, that the trial court would have rendered a verdict of guilty, even in the absence of the testimony concerning John Boone's statements. Accordingly, in applying the *Hasting* test, the Court concludes that the er-

**11.** Petitioner objects to the trial and appellate court's characterization of his statements, reported in the testimony of Scott Patterson and Orville Green, as an admission of the killing. (Doc. # 14 at 9 and 13). Petitioner contends that "John Boone's statements had the effect of encouraging the mistaken conclusion that the Petitioner's own statements were a confession to the killing." (Doc. # 14 at 7–8). Specifically, Petitioner argues that:

> [Without the interposition of John Boone's] assertion that the man was dead what you have is Ronald's admission that he hit the man because he didn't want witnesses. Knocking the man down could function to put the man in a position where he could not see him. This is very different from an admission of killing the decedent. (Doc. # 14 at 9).

A federal habeas court must treat factual determinations, made by state courts, including what a defendant admitted to his cohorts, with a high degree of deference. To reject a factual determination in the absence of procedural deficiencies enumerated in 28 U.S.C.A. § 2254(d)(1)–(7), the reviewing court must conclude that the state court's findings lacked even "fair support" in the record. *See* 28 U.S.C.A. § 2254(d)(8); *Sumner v. Mata*, 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982); *Marshall v. Lonberger*,

459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983). In the instant case, the trial court record does *not* lack fair support for the factual determination that Petitioner admitted the killing. The following exchange during cross-examination of Scott Patterson provides the requisite support for the state court's finding:

> Q. You indicated that Ronald said he had to kill the person because of witnesses, is that correct?
>
> A. (Scott Patterson) That's correct. (Tr. 126)

A similar exchange occurred during cross-examination of Orville Green (Tr. 174). Accordingly, this Court rejects Petitioner's argument for a reconsideration of whether or not Petitioner admitted the killing.

**12.** Although the trial court excluded from admission the exhibits containing the stained currency (Tr. 340–41), defense counsel did not move to strike the testimony of the criminalist who reported that the preliminary crime lab tests indicated that the stain on the currency was blood. (Tr. 297). This Court, therefore, like the appellate court, *see* note 5, considers the testimony of the criminalist. The trial court did not refer to the criminalist's testimony, or, of course, to the related exhibits, either in ruling on the motion for acquittal or in announcing the verdict of guilty.

ror was harmless.[13] Since the *Hasting* decision constitutes the most recent Supreme Court authority on the harmless error rule [14], it is clearly the controlling test in this Court. Therefore, having concluded that the error was harmless under *Hasting*, the Court denies Petitioner's application for a writ of habeas corpus. Petitioner's conviction for aggravated murder stands undisturbed.

The Clerk of Court will enter judgment for Respondent and journalize the dismissal of the petition.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**13.** In view of this Court's conclusion that the error in admitting the complained of evidence, regardless of its classification, was harmless, no evidentiary hearing is necessary.

**14.** This Court has searched, without success, for cases in which federal courts have analyzed the difference between the harmless error tests used in *Chapman* and *Hasting*. In one Sixth Circuit decision, *United States v. Robinson*, 716 F.2d 1095 (6th Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 722, 79 L.Ed.2d 183 (1984), the court set forth both tests in its harmless error discussion and stated that the *Chapman* test, as expressed in *Eberhardt v. Bordenkircher,* 605 F.2d 275 (6th Cir.1979), provides a particularized harmless error rule applicable to *Griffin* errors (improper comments made by prosecutor concerning a defendant's failure to testify at trial) 716 F.2d at 1099.

In *Williams v. Melton,* 568 F.Supp. 104 (N.D. Ga.1983), the district court, upon review of a Confrontation Clause violation, concluded that under either the *Chapman* or *Hasting* formulation of the rule, the error at issue therein was not harmless. 568 F.Supp. at 109. The court noted, however, that it was "uncertain whether the *Chapman* and *Hasting* statements of the applicable standard are entirely consistent." *Id.*

This Court does not attempt to either reconcile or distinguish the *Chapman* and *Hasting* tests. In denying Petitioner's application for a writ of habeas corpus, the Court merely applies these tests to the trial court record and then follows the most recent Supreme Court authority.